## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JAMES A. POUGES,**

        **Plaintiff,**

**vs.**                                    **No.  03cv0307 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

### MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Pouges') Motion to Reverse and Remand for a Rehearing **[Doc. No. 12]**, filed August 8, 2003, and fully briefed September 30, 2003.  The Commissioner of Social Security issued a final decision denying Pouges' application for supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand is not well taken and will be DENIED.

### I.  Factual and Procedural Background

Pouges, now thirty-nine years old, filed his application for supplemental security income benefits on February 5, 2001, alleging disability since October 1, 1992 (Tr. 195), due to rheumatoid arthritis.  Pouges has a high school education and one semester at TVI.  Tr. 45. Pouges has past relevant work as a cook and a waiter.  On January 25, 2002, the Commissioner's Administrative Law Judge (ALJ) denied benefits.  On May 28, 2002, the Appeals Council remanded the case for vocational expert (VE) testimony and further development of Pouges'

manipulative RFC and the physical demands of his past relevant work.  Tr.l 187-189.  On

September 25, 2002, the ALJ denied benefits, finding that Pouges "had no impairment of such

severity as to medically meet or equal the requirements of any impairment described in Appendix

1, Subpart P, Regulations No. 4."  Tr. 20.  Specifically, the ALJ reviewed Listing 1.00

(Musculoskeletal System).  *Id.*   Pouges filed a Request for Review of the decision by the Appeals

Council.  On February 3, 2002, the Appeals Council denied Pouges' request for review of the

ALJ's September 25, 2002 Decision. Tr. 8.   Hence, the decision of the ALJ became the final

decision of the Commissioner for judicial review purposes.  Pouges seeks judicial review of the

Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

2

evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to

the Commissioner to show the claimant is able to perform other substantial gainful activity

considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Pouges makes the following arguments: (1)  the ALJ

erred by making an improper RFC determination; and (2) the ALJ's finding that his testimony of

symptoms and functional restrictions were not supported by the evidence overall was erroneous.

## A.  RFC Determination

Residual functional capacity is defined as "the maximum degree to which the individual

retains the capacity for sustained performance of the physical-mental requirement of jobs."  20

C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  In arriving at an RFC, agency rulings require an

ALJ to provide a "narrative discussion describing how the evidence supports" his or her

conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's

ability to perform sustained work activities in an ordinary work setting on a regular and

continuing basis . . . and describe the maximum amount of each work-related activity the

individual can perform based on the evidence available in the case record."  *Id.*  The ALJ must

also explain how "any material inconsistencies or ambiguities in the case record were considered

and resolved."  *Id.*  "The RFC assessment must include a discussion of why reported symptom-

related functional limitations and restrictions can or cannot reasonably be accepted as consistent

with the medical or other evidence."  *Id.*

Pouges contends the ALJ's made an improper RFC determination and in support of his

contention makes the following arguments:  (1) the ALJ erred by admitting the consultative

examination and the DDS report into evidence; (2) the ALJ erred by relying exclusively on the

4

consultative examination and on the DDS assessment of his RFC; and (3) the ALJ erred by failing to elicit findings from the examining physicians to clarify the medical evidence.

Pouges contends the ALJ erred by relying on Dr. Toner's evaluation and on the April 27, 2001 RFC Assessment form completed by Dr. David Green and affirmed by Dr. Yoder.  Pouges argues this was error because Dr. Toner, a specialist in Occupational Medicine and Board Certified in Emergency Medicine, did not have all of his medical records before him.  Dr. Toner's evaluation indicates as follows:

> The claimant has full cervical, thoracic and lumbar range of motion with a negative straight-leg raising test.  Shoulders, elbows and wrists have full range of motion with the exception of his right wrist extending only to 30.  Hands have 3/5 grip strength but normal pinch and oppositional strength.  Hips and knees have full range of motion.  He has 1+ effusion to both of his knees with no evidence of any laxity.  Ankles have full range of motion.
>
> Cranial nerves II-XII are intact.  There is no evidence of any sensory loss to his upper and lower extremities.  He has 4/5 shoulder girdle and dorsiflexion of great toe strength bilaterally.  Deep tendon reflexes are 1+ and equal.  There is no evidence of any deformities and no evidence of any atrophy to the upper or lower extremities.
>
> Two views of the lumbar spine are obtained.  They are within normal limits with no evidence of any degenerative or inflammatory arthritis.  His SI joints are well maintained.
>
> Two views of the right knee are obtained and they are within normal limits.
>
> ASSESSMENT:  Rheumatoid arthritis.
>
> REMARKS:  This claimant has very little in the way of objective findings here.  it is apparent that he has been treated for rheumatoid arthritis and that this does affect how his joints feel.  However, with the exception of some mild effusion to both of his knees, I am unable to come [up] with any evidence of any erosive problems or inflammatory disease.  As a result of this examination, I feel this claimant should be able to lift 30 pounds on an occasional basis and 20 pounds frequently.  He should be able to stand or walk for six hours a day.  I would not restrict sitting.  I have no objective evidence to indicate that he cannot use his hands in a normal fashion, although his rheumatoid arthritis may cause him enough pain for him to be able to do any repetitive handling of materials or fine manipulation with his hands and fingers over several hours.
>
> This claimant's condition appears stable.  At the present time, it is possible that it is going to continue to increase in severity over time.

Tr. 275, 276.  Dr. Toner also completed a Medical Source Statement of Ability to do Work-Related Activities on April 17, 2001.  Dr. Toner found Pouges could occasionally lift 30 pounds in an 8 hour workday, frequently lift 20 pounds in an 8 hour workday, stand and/or walk up to 6 hours in an 8 hour workday, and was not limited in his ability to sit.  Tr. 280-281.  Dr. Toner also found Pouges had no limitations as far as overhead reaching, handling of objects, speaking, hearing, traveling, or fine manipulation.  Tr. 281.

Relying on Dr. Toner's evaluation, Dr. Green completed a Physical RFC Assessment form on April 27, 2001, and found Pouges could occasionally lift and/or carry 30 pounds, frequently lift and/or carry 20 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and push and/or pull was unlimited.  Tr. 283. In support of these findings, Dr. Green noted: "CE dated 4/18/01 notes FROM in back and all joints except right wrist which has decreased extension to 30 degrees.  Grip strength is decreased to 3/5 but pinch and oppositional are normal.  DTR's 1+ and equal.  No deformity or atrophy noted. 1+ effusion of knees bilaterally.  Xrays of L-spine and knees were WNL."  Tr. 283.  Dr. Green also cited to Dr. Farrell's April 10, 2000 evaluation (Tr. 249, 251).  Tr.284.

Pouges concedes that Dr. Toner reviewed Dr. Sibbett's November 27, 1993 letter of disability and Dr. Farrell's April 10, 2000 evaluation.  Pouges, however, objects to Dr. Toner not having his treatment records from his Correctional Medical Services (CMS) physicians dated September 1999 through July 2000, and the treatment records from Western New Mexico Medical Group (WNMMG), dated October 2000 through April 2001, available for review.  The records from CMS indicate the following:

On September 27, 1999, a health care provider referred Pouges for a physical therapy evaluation because Pouges reported physical therapy had helped his condition in the past.  Tr. 266.

On October 4, 1999, a physical therapist performed the evaluation. Tr. 265.  The physical therapist noted Pouges complained of left shoulder pain for 1 ½ months and described the pain as "slight" and reported it occurred mostly at night.  Pouges also reported his left shoulder hurt with lifting.  The physical therapist's examination indicates Pouges had palpable tenderness of his left anterior shoulder, a normal left wrist joint but painful with movement, full pronation and supination, the grasp on the right was five pounds and the left was 20 pounds.  The physical therapist assessed Pouges as having rotator cuff impingement and left wrist pain.  The physical therapist set Pouges goals as "regain pain-free movement and function of the left shoulder and left wrist" and instructed Pouges in isometric shoulder exercises.

On October 18, 1999, the same physical therapist evaluated Pouges.  Tr. 264.  At that time, Pouges reported "he was started up again on arthritis medication last week and feels much better in hands and left shoulder."  *Id.*  The physical therapist assessed Pouges as "shoulder is pain free currently."  *Id.*

On September 30, 1999, Pouges' right wrist x-ray indicated "[E]vidence for degenerative joint disease. No other abnormality is noted."   Tr. 263.

On December 7, 1999, Pouges reported pain in his wrists and hands.  Tr. 259.  The CNP (Certified Nurse Practitioner) prescribed Prednisone for two weeks.  The CNP assessed him with "R/A flare 3-4 days ago."  *Id.*  The physical examination indicated Pouges had swollen metacarpophalangeal joints and wrists.  The CNP scheduled an appoint with Dr. Porter.

On December 13, 1999, Dr. Porter evaluated Pouges' "prednisone dosage and use."  Tr. 258.  Pouges reported he thought something was wrong with his left wrist because he experienced pain if he moved it "the wrong way."  *Id.*  Dr. Porter noted no numbness but slight tingling in the wrist.  Dr. Porter noted Pouges was doing much better.  Pouges reported he had no pain or swelling when on prednisone but experienced swelling of his hands when he was off prednisone. Dr. Porter's examination indicated Pouges had pain of his left wrist with movement.  Dr. Porter assessed Pouges as having rheumatoid arthritis and noted he was unable to discontinue the prednisone.  Dr. Porter requested a consultation with a rheumatologist and orthopedist, ordered a left wrist x-ray, and recommended a wrist support.

On April 26, 2000, x-rays of Pouges right hand indicated "Normal right hand."  Tr. 262.

On July 11, 2000, Pouges complained of a painful left wrist.  Tr. 257.  The health care provider noted swelling over the left wrist, pulses were normal, ROM was limited, and the neurological examination was normal. An x-ray of the left wrist was ordered for the following day, ice and an ace wrap was recommended and ibuprofen prescribed.

On July 17, 2000, a physician evaluated Pouges.  Tr. 256.  The physician noted "He has pain in the left wrist but this resulted from trauma to the left wrist.  He denies any joint aches, swelling, pain stiffness or limitation of movement."  *Id.*  The physical examination indicated Pouges had "left wrist slightly tender, no erythema, negligible swelling, full range of motion here and full range of motion in all other joints, no inflammatory changes in any other joint."  *Id.*  The physician assessed Pouges with "Rheumatoid arthritis without any debilitating complications, doing well on methotrexate, no complications noted from use of methotrexate yet, last

8

hematology and biochemistry profile essentially normal." *Id.* The physician recommended Pouges continue on the methrtrexate and ibuprofen and folate.

The records from WNMMG indicate as follows:

On October 24, 2000, Pouges went to WNMMG for medication for his rheumatoid arthritis. Tr. 273. Ms. Edith Ivan, a Certified Family Nurse Practitioner, noted Pouges was last seen in 1994. Pouges reported he was taking methotrexate and was feeling better but was just released from prison and had "just run out of medication." *Id.* Ms. Ivan noted Pouges was in no apparent distress and noted "finger and hand joints slightly puffy– little lateral movement yet." *Id.* Ms. Ivan directed Pouges to continue with his medication and return for lab work on October 27, 2000. Ms. Ivan also noted she would refer him to UNM Rheumatology.

On October 27, 2000, Ms. Ivan noted she had received the original lab and x-ray reports from Los Lunas Correctional Facility. Tr. 273. Ms. Ivan told Pouges to return in two months and as needed for lab work. Ms. Ivan also instructed Pouges on methotrexate precautions and the use of alcohol. On that same day, Ms. Ivan noted a telephone call from Dr. Bankhurst with the Rheumatology Department at UNM. Dr. Bankhurst directed Ms. Ivan to manage Pouges at WNMMG until he developed problems and ordered a Hepatitis Virus A, B, C screen. Dr. Bankhurst ordered methotrexate 2.5 mg iii every day.

On November 18, 2000, Pouges returned to WNMMG for lab work. Tr. 272.

On November 28, 2000, Pouges returned to WNMMG for his follow-up. Tr. 272. Ms. Ivan noted Pouges' rheumatoid arthritis was stable with some wrist pain. The physical examination indicated "no joint deformity." *Id.* Ms. Ivan ordered lab work and told Pouges to return in one month.

On January 26, 2001, Pouges returned to WNMMG.  Tr. 271.  Pouges complained of having more joint pain in his left hand and shoulder but Motrin was not helping.  Pouges also reported he had tried Naprosyn but had stomach problems.  Ms. Ivan's physical examination indicates she examined Pouges throat, nose, neck lymph nodes, chest and abdomen.  There is no mention of a musculoskeletal examination. Ms. Ivan assessed Pouges as having rheumatoid arthritis, abdominal pain, and allergic rhinitis.  Ms. Ivan discontinued the Motrin and prescribed Celebrx 200 mg twice a day, Prilosec 20 mg, Claritin D one tablet twice a day, and ordered lab work to rule out H. Pylori.  Ms. Ivan scheduled Pouges for an appointment in two weeks.

On February 9, 2001, Pouges returned for his follow-up.  Tr. 271.  Pouges reported the Prilosec had given him a rash and the Celebrex had not helped his arthritis at all.  The physical examination indicated Pouges had no swollen joints and no rash.  Ms. Ivan ordered lab work and prescribed an antibiotic.  Ms. Ivan noted she would wait to try a new arthritic medication after Pouges had completed the antibiotic treatment.  Ms. Ivan instructed Pouges to return in two weeks.

On March 1, 2001, Pouges returned to WNMMG with complaints of cold symptoms.  Tr. 270.  Pouges complained the cough had increased his arthritic pain.  Ms. Ivan assessed Pouges as having bronchitis and treated him for this.  Ms. Ivan also started Pouges on Arthotrec (used in the treatment of rheumatoid arthritis) and directed Pouges to return in one month for lab work.

On April 13, 2001, Pouges returned to WNMMG for his follow-up and for more medication.  Tr. 268.  Pouges reported his arthritis was bad, and he could only walk two blocks.  Ms. Ivan's physical examination indicated slight swelling of some finger joints and full range of motion.  Ms. Ivan assessed Pouges as having rheumatoid arthritis, allergic rhinitis, and tooth

10

abscess.  Ms. Ivan treated him accordingly and instructed Pouges to return for his methotrexate lab work in two months.  Pouges had some other lab work done that day.

On April 17, 2001, Pouges' lab work indicated he was "ok on methotrexate."  Tr. 269. Ms. Ivan noted Pouges would have repeat lab work in two months.

On June 13, 2001, Pouges returned for a follow-up and also requested Claritin.  Tr. 298. The physician evaluated Pouges on that day and noted "hands– minimal bony deformation, no swelling; knees– right knee with palpable bony deformity but no effusion."  *Id.*  The physician ordered lab work and instructed Pouges to call Ms. Ivan for Arthrotec samples and gave Pouges Claritin samples for his allergic rhinitis.

On August 3, 2001, Pouges returned for his follow-up and also requested more medication for his arthritis and his allergic rhinitis.  Tr. 298.  Pouges complained of allergies and stomach problems.  Ms. Ivan noted "hands– minimal deformity, no swelling; knees, right– no swelling, slightly abnormal."  *Id.*  Ms. Ivan ordered lab work and treated his rhinitis and stomach problems.  Ms. Ivan instructed him to return in two months.

On August 10, 2001, Pouges returned for his follow-up.  Tr. 297.  Pouges complained of abdominal pain.  Ms. Ivan noted Pouges had a history of hemorrhoids.  The examine revealed mild epigastric pain.  Ms. Ivan discontinued the Arthrotec for one week, prescribed Colace (used for constipation) and Nexium.  Ms. Ivan also sent Pouges home with a Hemicult Kit and explained its use.  Ms. Ivan directed Pouges to return in one week.

On August 16, 2001, Pouges returned for his follow-up.  Tr. 297.  Pouges was still complaining of constipation and blood in his bowel movements.  The Hemicult cards were

positive.  Ms. Ivan instructed Pouges to stay off the Arthrotec until he saw a GI (gastrointestinal) physician.  Ms. Ivan referred him to the UNM GI Clinic.

On September 13, 2001, Pouges failed to show up for his appointment.  Tr. 296.

On October 12, 2001, Pouges returned for his follow-up.  Tr. 296.  Pouges reported he had been to the UNM GI Clinic and was going to see a surgeon for a hemorrhoidectomy.  At that time, Pouges also gave Ms. Ivan "papers from his lawyer" and reported "little change in arthritis, hand pain and knee pain– swelling in both areas most of time, decreased movement, back bothers, he does a lot of sitting."  *Id.*  Ms. Ivan assessed Pouges as having rheumatoid arthritis and mild anemia.  Ms. Ivan ordered lab work for the following Monday.  Significantly, Ms. Ivan noted: "Eval from lawyer filled.  Discussed need for SS M.D. to eval. & my eval. means little, pt. understood."  *Id.*

Ms. Ivan completed the Medical Assessment of Ability to do Work-Related Activities (Physical) on that day.  Tr. 293-295.  Ms. Ivan noted Pouges could only lift and/or carry 5 pounds due to swelling in his fingers and hands, could only stand/walk for 2 hours and one hour without interruption because of swelling in his knees; could only sit for 2 hours and one hour without interruption because of back pain, could never climb, could frequently balance, occasionally stoop, never crouch and never crawl because of swelling of his knees and back pain; was limited in his ability to reach, handle, and push/pull due to swelling of his hands and knees; was limited around moving machinery and extreme temperatures due to selling of his hands and knees.  *Id.* Dr. Gibson signed the form, indicating agreement with Ms. Ivan's findings and assessment.  Tr. 296.

The CMS and WNMMD medical records substantially support Dr. Toner's findings and conclusions.  Accordingly, the ALJ did not err by admitting Dr. Toner's consultative examination and Dr. Green's Physical RFC Assessment form into evidence.

Pouges also argues the ALJ erred by relying on the opinions of non-treating physicians, specifically, Drs. Toner and Green.  Additionally, Pouges contends the ALJ should have sought "clarification of the basis of the treating source assessments of [his] limitations."  Pl.'s Mem. in Supp. of Mot. to Reverse at 11.

A treating physician may offer an opinion about a claimant's condition and about the nature and severity of any impairments.  *Castellano v. Secretary of Health and Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  The regulations provide that the agency generally will give more weight to medical opinions from treating sources than those from non-treating sources and that the agency will give controlling weight to the medical opinion of a treating source if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2).

Unless good cause is shown to the contrary, the Commissioner must give substantial weight to the testimony of the claimant's treating physician.  If the opinion of the claimant's physician is to be disregarded, specific legitimate reasons for this action must be set forth.  *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).  "'In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.'"  *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)(quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.

13

2000)).  An ALJ may not substitute his own opinion for a medical opinion.  *See Sisco,* 10 F.3d  at

744.  However, a treating physician's opinion that a claimant is totally disabled is not dispositive

"because final responsibility for determining the ultimate issue of disability is reserved to the

[Commissioner]."  *Castellano,* 26 F.3d at 1029.

> In his decision, the ALJ noted Dr. Gibson's and Ms. Ivan's opinions and found:
>
> > I am aware that the claimant's doctor and nurse have given their opinions that he is unable to lift more than 10 pounds, or sit, stand or walk for more than two hours out of an eight hour workday (Exhibit 9F).  However, their opinions are conclusory in nature, and not supported by the results of their own clinical examinations of the patient or his low sed rate finding.  Although they state that the claimant has such severe problems due to swelling of his fingers, back and knees, they do not indicate what condition causes back swelling, and their treatment notes indicate that the claimant often has no swelling of his knees (Exhibit 10F).  His consultative examination was noteworthy for no findings of swelling in his hands, or any evidence of inflammatory joint disease.  Moreover, the claimant's sed rate measured 7, well below the normal reading of 15 (Exhibit 10F).  The opinion of the claimant's doctor and nurse appear to be based on the claimant's reports of symptoms, which I do not find fully credible for the reasons stated in Finding #4 above.  For all the above reasons, I do not accord the claimant's treating physician's opinion controlling weight herein.

Tr. 21.  In this case, the ALJ set forth specific legitimate reasons for disregarding Dr. Gibson's

and Ms. Ivan's opinions.  Specifically, the ALJ found their opinions were conclusory and not

supported by the results of their own clinical examinations or Pouges' low sed rate finding.

Substantial evidence supports these findings.   The ALJ also concluded that their opinions were

"based on the claimant's reports of symptoms" as opposed to the objective medical evidence.  Tr.

21.  The medical opinion of a treating source is entitled to controlling weight **only** if it is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2).  In this case, Ms.

Ivan's opinion and Dr. Gibson's opinion are not supported by their own clinical findings.  The

ALJ also found their opinions inconsistent with the other evidence in the record, which is

substantial.  Accordingly, the ALJ has shown good cause for disregarding Ms. Ivan's and Dr. Gibson's opinions and properly relied on Dr. Toner's evaluation.

Finally, Pouges' argument that "the ALJ had a duty to elicit further findings" from Dr. Gibson when he did not accord Dr. Gibson's opinion controlling weight is without merit.  Pl.'s Mem. in Supp. of Mot. to Reverse at 11.  Pouges contends "[t]he ALJ should have contacted [his] treating sources to obtain specific clinical findings regarding the symptoms and functional difficulties used to determine that [his] ability to work [was] compromised.  *Id.*  The duty to recontact the physician is triggered by the inadequacy of the evidence the ALJ receives from a claimant's treating physician and not by the rejection of the treating physician's opinion.  *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).  In this case, the ALJ found the medical evidence he received from Dr. Gibson adequate for his consideration.

## B.  Credibility Determination

Pouges contends the ALJ's finding that his testimony of symptoms and functional restrictions were not supported by the evidence overall is erroneous.  Pl.'s Mem. in Supp. of Mot. to Reverse at 12.  Pouges argues that the ALJ "must make an express credibility determination if he does not believe the claimant's pain testimony."  *Id.*

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence.  *Qualls v. Apfel*, 206

F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on

in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of

the claimant in his overall evaluation of the claimant's credibility.  *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of

medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the

frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's

credibility, and the consistency or compatibility of nonmedical testimony with objective medical

evidence.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quotations omitted).  The

inability to work pain-free is not sufficient reason to find a claimant disabled.  *See Gossett v.*

*Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

In evaluating the severity of Pouges' impairment, the ALJ found Pouges' reports and

testimony of symptoms and functional restrictions in the disabling degree alleged were not

credible because they were not supported by the evidence overall.  The ALJ set out the objective

medical evidence that he found inconsistent with Pouges testimony of disabling pain.  Tr. 21.  The

ALJ also considered the effectiveness of Pouges' medication and noted that, although Pouges

testified his medications were only partially helpful, his treatment notes indicated his condition

improved with his medications.  This finding is supported by substantial evidence.  *See* Tr. 264,

258, 256, 273, 269.

The ALJ also found "[while] the claimant testified that he stopped working due to hand

pain, his examinations noted minimal bony deformities and swelling."  Tr. 20.  The ALJ also

noted "[a]lthough he alleges that he is unable to work, the record indicates that he worked in food

service while he was in prison, and there is no evidence that his medical condition has worsened

16

since that time."  These findings also are supported by substantial evidence.  *See* Tr. 264

(shoulder is pain free with medication); Tr. 258 (no pain or swelling when on prednisone); Tr. 256

(left wrist slightly tender, negligible swelling, full range of motion in all other joints no

inflammatory changes in any other joint & rheumatoid arthritis without any debilitating

complications); Tr. 273 (fingers and hand joints slightly puffy); Tr. 272 ( rheumatoid arthritis

stable with some wrist pain but no joint deformity); Tr. 271 (no swollen joints); Tr. 268 (slight

swelling of some finger joints and full range of motion); Tr. 298 (minimal bony deformation, no

swelling, no knee effusion).  Thus, although the ALJ found Pouges had rheumatoid arthritis, a

pain-producing impairment, nonetheless, he found it was not disabling.  Accordingly, the Court

finds that the ALJ's credibility determination is supported by substantial evidence.

Pouges also contends the ALJ failed to consider his WNMMG treating physician's opinion

that he avoid temperature extremes.  However, the record indicates the ALJ's hypothetical to the

VE included this limitation.  Tr. 22, 116.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**

17